[Cite as *In re M.C.*, 2019-Ohio-771.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

IN RE: M.C.

C.A. No.     29191

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.     DN 17-12-0993

DECISION AND JOURNAL ENTRY

Dated: March 6, 2019

CARR, Presiding Judge.

**{¶1}** Appellant, Chrystal S. ("Mother"), appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that adjudicated her minor child abused and dependent and placed the child in the temporary custody of Summit County Children Service Board ("CSB"). This Court affirms.

I.

**{¶2}** Mother is the biological mother of M.C., born October 2, 2014. The child's father did not appeal from the trial court's judgment. M.C.'s adjudication is closely tied to a case involving another child, D.S., who is not Mother's child and is not a party to this appeal.

**{¶3}** CSB filed a complaint, alleging that M.C. was an abused, neglected, and dependent child because, on September 22, 2017, he had been in the same room with his six-month-old cousin, D.S., when D.S. somehow ingested and overdosed on a synthetic opioid. When police and paramedics responded to a report of an infant choking, five adults were in the

home, but only three of them were downstairs where the children were. Apparently only the children's great-grandmother had been in the room with them at the time she noticed that D.S. became fussy and eventually unresponsive. She could not explain what had happened to D.S., but she told the police that she thought that D.S. might have choked on a Life Saver. The police officer did observe many Life Savers, small toys, and other items scattered on the floor in the room where the children had been. At the hospital, D.S. was successfully treated with Narcan, an opioid reversal drug.

{¶4} The matter proceeded to an adjudicatory hearing before a magistrate. The magistrate's decision, which was later adopted by the trial court, adjudicated M.C. an abused and dependent child. Following a dispositional hearing, M.C. was placed in the temporary custody of CSB. Mother filed written objections to the magistrate's decisions, which were overruled by the trial court. Mother appeals and raises one assignment of error.

II.

**ASSIGNMENT OF ERROR**

THE FINDINGS OF ABUSE AND DEPENDENCY ARE AGAINST THE
MANIFEST WEIGHT OF THE EVIDENCE.

{¶5} Through her sole assignment of error, Mother asserts that the trial court's adjudications of M.C. as an abused and dependent child were not supported by the evidence presented at the adjudicatory hearing. The trial court found M.C. to be an abused child under R.C. 2151.031(B), which defines an abused child as an "endangered" child, as defined by the criminal statute. R.C. 2919.22(A) defines an endangered child to include one whose parent has "create[d] a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support." The court also adjudicated M.C. as a dependent child under R.C.

2151.04(C), which defines a dependent child as one "[w]hose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship[.]"

{¶6}     This Court will review the two adjudications together because the evidence about what transpired in Mother's home on September 22, 2017, supported both adjudications.  CSB presented evidence to demonstrate that Mother had created a substantial risk to the safety of then two-year-old M.C. and that, for that reason, the state was warranted in assuming the child's guardianship.  *See*, *e.g.*, *In re R.R.*, 9th Dist. Summit No. 28197, 2016-Ohio-8285, ¶ 6-8 (concluding that evidence of drugs in the home of young children established both abuse under R.C. 2151.031 and dependency under R.C. 2151.04(C)).

{¶7}     Akron Police and paramedics responded to Mother's home on the afternoon of September 22, 2017, to a 911 call about an unresponsive infant.  Paramedics began artificial respiration and rushed D.S. to Akron Children's Hospital.   After D.S. and his mother (M.C.'s aunt) left with the paramedics in an ambulance, police officers and detectives conducted an investigation by interviewing the remaining adults in the home: Mother, Mother's boyfriend, the aunt's boyfriend, and the great-grandmother of M.C. and D.S.

{¶8}     At the adjudicatory hearing, CSB presented evidence about what the adults in the home had told police.  The aunt and her boyfriend had been in the home and were downstairs after the incident, but it is unclear where they were when D.S. began exhibiting symptoms.  One of the first officers on the scene spoke to the children's great-grandmother, who was in the room with both children when the police arrived and said that she had been with them when D.S. began displaying signs of distress.  She explained that D.S. had been fine, became fussy, and then was unresponsive.   She told the officer that she believed that D.S. had choked on a piece of candy.  Based on his experience as a police officer, which had included responding to the scene

of an infant who had overdosed and died, he believed that D.S. had ingested an opioid. Because M.C. had been playing in the same room with D.S., he had been exposed to the same danger, so the police removed him from the home for that reason.

{¶9} The police walked through the home to locate Mother and found her with her boyfriend in an upstairs bedroom. A detective who later arrived at the scene interviewed Mother. Mother said that she had been sleeping with her boyfriend during the medical emergency with D.S. She told the detective that she had not heard the screaming and commotion while the three adults attempted to revive the unresponsive infant and called 911. In fact, she said that she was not aware that paramedics had come and taken D.S. to the hospital.

{¶10} The detective, a 26-year veteran member of the Akron Police Department, testified that he observed track marks on the arms of Mother and her boyfriend, which he believed were "an indication of IV use of drugs[.]" The detective described the "very distinctive" appearance of track marks in great detail.

{¶11} The detective explained that he had seen track marks quite often during his experience with the police department as well as through his part-time job working with overdose victims at a local hospital. He further testified that the Akron area had been dealing with "almost an epidemic [of drug use]" during the past six years and that, through his frequent contact with IV drug users, he was certain that he had observed track marks on the arms of Mother and her boyfriend. Although Mother admitted to him that she had a prior history of drug use, she denied any recent use or that there were drugs in the home.

{¶12} CSB also presented the testimony of a doctor from Akron Children's Hospital, who explained how she diagnosed and treated D.S. When D.S. arrived at the emergency room, he was breathing shallowly and was unresponsive. The typical causes of those symptoms in an

infant are infection, injury, or ingestion. The doctor detailed some of the tests that were performed to determine the cause of the child's medical distress. A physical examination of the child's body failed to reveal any apparent signs of infection or injury and, because D.S. also had pinpoint pupils, the doctor suspected that he had ingested an opioid. The doctor further explained that she had treated other infants who had overdosed on opioids and D.S. exhibited the same symptoms.

{¶13} Her next step was to treat N.S. with a dose of Narcan. The doctor explained that Narcan was administered because it would cause no harm to the child and, if D.S. had ingested an opioid, Narcan would reverse his symptoms within a minute or two. As the doctor had anticipated, moments after she gave Narcan to D.S., he began kicking, opened his eyes, and became alert and responsive.

{¶14} A CAT scan, blood work, and other testing of D.S. further ruled out any infection or injury. The blood tests conducted on D.S. included a coma panel and a test to detect certain opioids. Although no specific opioid was detected in the child's blood, the failure to detect a specific opioid did not rule out an opioid overdose because the test screens for only specific, known opioids. The doctor explained that the science of drug testing cannot keep up with the continual development of new synthetically-made opioids. The doctor ultimately concluded that D.S. had overdosed on a synthetic opioid.

{¶15} Although Mother points to evidence that the great-grandmother was supervising the children, it is unclear who, if anyone, was watching six-month-old D.S. and two-year-old M.C. at the time that D.S. was able to ingest an opioid. Moreover, even if an adult had been watching them, six-month-old D.S. somehow had overdosed on an opioid in the same room where he had been with two-year-old M.C. and none of the adults in the home had protected the

children or could explain to the police how that had happened. Throughout that time, Mother was upstairs sleeping so soundly that she had not even heard or come downstairs to assist the other adults or her child during D.S.'s medical emergency. She later admitted to the police that she was concerned for the safety of M.S. because he had been in the same room with D.S. at the time.

{¶16} The trial court had clear and convincing evidence before it to support its conclusion that Mother had created a substantial risk to the safety of her young child and that, for that reason, the state was warranted in assuming M.C.'s guardianship. Mother's assignment of error is overruled.

III.

{¶17} Mother's assignment of error is overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

_____

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

HENSAL, J.
SCHAFER, J.
CONCUR.


APPEARANCES:

ANGELA M. KILLE, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and JACQUENETTE CORGAN, Assistant Prosecuting Attorney, for Appellee.